A District Court may not assume the extraordinary role of Superwarden unless it properly finds that the real warden has abdicated its responsibility. The District Court never found this and the evidence did not come close to showing it. Rather, what the evidence showed was that without ever being ordered to do so, Miami State County enacted and implemented sweeping measures designed to protect inmates from COVID-19, including many measures that were not required by either the CDC or the TRO and went well beyond what most jails in this country were doing. Rather than commend the county for taking these steps, as the independent inspection did, or assess whether the county was substantially compliant with the TRO, which the independent inspection found, the District Court rejected these measures as insufficient based on the rise of asymptomatic positive cases occurring in the jail. Every step of the District Court's reasoning was infected with legal error, beginning, of course, with its improper collapsing of the objective and subjective froth of deliberate indifference. By focusing on defendants' inability to achieve what it called meaningful social distancing and deeming the measures defendants could and did actually control ineffective based on the rise in asymptomatic positive cases, the District Court plainly violated Farmer and imposed a form of strict liability that the Eighth Amendment prohibits. The District Court's dispositive finding that the failure to prevent widespread asymptomatic infection is a basis for liability is especially troubling and creates a dangerous incentive for jails in this country to ignore best practices in testing and cohorting for fear of liability. Mr. Greenberg, this is Beverly Martin. As I understand your argument, you say Director Jr. does not have the authority to reduce the population in the jail. Is that, have I got that right? That's... That's true, Your Honor. You say he's without authority. I'm sorry? That's absolutely true, Your Honor. Okay. Director Jr. Yes. Okay. Tell me what deprives him of that authority. Is there a state law, a municipal law? What deprives him of the authority to reduce the population? Sure. Well, it's a combination, really, of all the state laws and court orders that entrust individuals into the jail. Unlike in the case of, for example, an ICE detention center, the prosecutor and the jailer are completely different entities in the state of Florida. So, every single defense detainee who is in a Miami-Dade County jail is in there because a state court judge has ordered that detainee to be there. So, if Director Jr. were to release someone who a state court judge has ordered into his custody, he would be violating an order of a state court judge. Okay. So, it's basically state law is what you're, you're saying. Yeah. Yeah. Yeah.  So, it's basically state law. And if that's the issue that Your Honor wants me to address, I'll begin with that, because the holding that the plaintiffs are asking this court to adopt on appeal, which was not a holding that the district court actually made, that the defendant can be deliberately indifferent for failing to release inmates. Let's not make any mistake about what the consequences of that is. They are essentially asking this court to create a right that would apply throughout the 11th Circuit that all inmates have a right to release in the midst of COVID, despite the fact that, in this case, the jail is not overcrowded. It is one-third under capacity. I don't think I need to explain to the court what the implications of that holding would be. There is no precedent. Can I just... I just wanted to follow up. So, one of the amici briefs in this case, which I thought were really helpful, refers to Florida Statute 951.23, paren 7, which allows for the use of reduced custody housing. Doesn't that give Director Junior the authority to reduce the population in the jail? I think that the statute that you're citing may apply to sentenced inmates, but the inmates that are in direct...that are in the county's custody are inmates that are, for the most part, pre-trial detainees. So, a lot of the citations in those briefs having to do with game time and things like that really would not apply in the situation of pre-trial detainees. And of course, none of those arguments were ever raised by the plaintiffs in this case. What are reduced custody housing areas? Are you familiar with that concept? Well, in the county jail, the only thing that I'm familiar with is that there are inmates who are released on their own recognizance pre-trial, and there are inmates who are allowed to go home on weekends. And in those cases where the courts have permitted that, they have stayed home and not come back into the jail. But the county, other than release on their recognizance or house arrest, things like that, does not have the independent authority to do that. In each of those cases, it would be a state court judge who is making those decisions. And just the only thing that the county has done and can do is give information and spur on the state court criminal justice system to release inmates if it believes it can safely do so. And that's a very important point. Every single inmate who has to go through the process of release in state court, and the district court credited this testimony, is being evaluated on a case-by-case basis by the public defender, the state attorney, and the state court judges. And that system has resulted in the release of hundreds of inmates in Miami-Dade County. Of course... Hold on. Can I just follow up one more time on this discretion question? So, in the brief, I think there was the hypothetical of the prison was at the foot of the dam and the dam was about to break, and in your reply brief, I understood you to say, yeah, we would get the inmates out of there. Is that... I mean, if you can do it under that hypothetical, why can't you do it here? Well, that was half of the answer in the reply brief. The other half was that, unlike in that scenario, this danger that is posed by a pandemic is not a danger that is a localized danger that is going to evade once we move the inmates. It is a danger that is now present throughout the country in every single jail. And in that case, even with the answer of a jail about to flood, we would, of course, still maintain custody of the inmates. The idea that the jail has to just start releasing inmates indiscriminately is frankly not supported by any case law. And as Justice Sotomayor's stay order last week strongly indicates, that is not a remedy that the Supreme Court is likely to bless in this type of situation. I don't think anybody is calling for that random widespread, you know, unconsidered release of all inmates. Nobody's calling for that. Well, that's exactly the... I don't think the district court's orders call for that. Well, the district court felt she was unable to do that because a three-judge panel hadn't been convened. But it is exactly what the plaintiffs are calling for. The relief that they've sought is for every single individual who is over 60 years of age or has some medical condition to be released, which would be hundreds and hundreds of inmates. And it is an extraordinary request to ask a federal court to intrude into the state court prison system, a system that is presently evaluating inmates for release based on their medical condition and on a case-by-case basis. There is simply no reason to believe that the district court's usurpation of local control will cure the difficulties posed by this pandemic. The standard of liability that the district court imposed below would, in fact, lead to every single jail in this country with dormitory housing being found deliberately indifferent. And that order that Judge Sotomayor stated was premised on the very same finding that the plaintiffs are asking this court to latch onto here, that the inability to maintain six feet of social distancing in all cases automatically renders the jail deliberately indifferent despite all the other efforts that they've taken. In this case, the district court's injunction was especially inappropriate because it simply enjoined that the county to take actions that they were already voluntarily taking. And the new measures in the injunction were all measures that the county had already adopted on its own. The district court's balancing of the harm in this case bore absolutely no resemblance to what was actually being done by the county, which was to proactively adopt measures. And when new technologies came about, to adopt additional measures to protect the inmates from COVID-19. Mr. Greenberg, I mean, you acknowledge that there's a dispute of fact about what steps you had taken. I mean, I've read the declarations of the inmates, and suffice it to say, they say that there are not steps being taken with regard to cleanliness and social distancing, that there's still many problems in that regard. So there's a dispute of fact. I mean, I understand your position, but you understand there's another position as well. Well, first of all, though, the district court's order was not based on resolving those disputes. The district court's twice stated that it was finding deliberate indifference without resolving any factual disputes regarding the implementation and the efficacy of the county's measures. If I could just finish my answer, and in addition, the district court completely ignored the independent inspection that it ordered, which did not find that the defendants were noncompliant with the TRO in any respect, and which completely disputes all of the inmate declarations that there was insufficient soap or hygiene or cleanliness. Two doctors towards the facility visited over half a dozen cells and found that they said as well that the population needed to be reduced in order for CDC standards about social distancing to be possible, didn't they? Well, they said that. It's not clear that they were referring to the CDC's jail standards because the CDC standards for jails do not contemplate that six feet of social distancing can be maintained in all cases. And although they did make that recommendation, ultimately, that recommendation is insufficient to overrule Farmer and Monell and the very stringent standards of liability that apply in this case. All right. All right. Mr. Greenberg, I know your time's up, but I'd like to get your answer to one question on that point. If the only remedy for the condition at Metro West on April 29th was limiting the population, is the correct defendant sued in this case to get that relief? If that's the only remedy, the correct defendant is sued, and that defendant is Miami-Dade County. I think that the plaintiffs fail to appreciate that as a charter county, Miami-Dade County is structured differently than the other 66 counties in Florida in that the mayor and not the director of the prison exercises the powers of the sheriff. So Director Jr. is a superfluous party for every claim that the plaintiffs have asserted. Okay. Thank you.  COVID-19 is a highly contagious disease that can cause severe pain, irreversible organ damage, and even death to those who contract it. Because there's no known effective treatment, governments around the world have recognized that prevention is essential to prevent grave harm and death. And there's one prevention measure that experts agree is critical, and that is social distancing. But as the district court found, those detained at Metro West are being forced to live in housing units where adequate social distancing is impossible, and even feasible social distancing is not being enforced. Undisputed evidence, for instance, shows that detainees are being forced to live in housing units with dozens of other people, sleeping on bunks that are close enough people can reach out and touch the people next to them. Two experts who toured Metro West, one chosen by each side, concluded that the facility is far too crowded to control transmission of COVID-19, and that an urgent population reduction in this facility is needed. Defendant Jr., on behalf of the state, nevertheless continues to confine too many people at Metro West, even though it's undisputed that everyone knows confining people without social distancing poses a serious risk to their health and lives. Doing so with this awareness, as the district court found, reflects deliberate indifference to the health and lives of the people at Metro West. Defendant's only answer is that state law prevents Daniel Jr. from releasing anyone in his custody, but they don't cite any authority, and the state panel also cited none, for the proposition that lack of state law authority to take an action precludes a finding of a constitutional violation in an injunctive release case. In fact, defendants don't even really seem to believe that argument. In their reply, they say that if they were presented with a situation, for instance, in which state law barred them from providing food and water, they would, of course, act, no doubt, because they are aware that food and water are vital, and that not providing it would be cruel and inhumane. Can I ask you a quick question? So I feel like there's a disconnect between the parties here about what the district court's order said and didn't say, did, and didn't do. It seems like, as I read the district court's order, I guess, beginning around 35, well, at page 37, the district court basically says two things with respect to deliberate indifference. One, there are lots of factual disputes here about sort of the sufficiency of what the defendants have done. I'm not going to resolve any of them. And instead, I'm going to rely on two things, one, the fact that the virus has spread, that they haven't contained it, and two, that social distancing, six-foot, CDC-style social distancing is impossible. And then at page 38, the district court says, thus, plaintiffs have met both the subjective and objective components of the claim. And then, but in your brief, you seem to say, in essence, that's not what the order is about at all. It's about the failure to achieve what you call feasible social distancing, and that Junior was somehow deliberately indifferent for refusing to release people. I just don't see that in the district court's order. Where does that come from? Where is it part of the district court's analysis that those things are what renders, render the defendants deliberately indifferent here? Well, first, on the question of feasible social distancing measures, I think that's the clear implication of reading the court's opinion alongside its injunction. The district court recites numerous places on pages 12 to 16 in which social distancing is not occurring within the jail. The court clearly credits those declarations and that evidence on pages 37 to 38 in concluding that social distancing is not happening within the jail. And then in the injunction, the district court acknowledges that the defendants have not implemented feasible social distancing measures by directing them to submit a proposal within seven days. But even if there's any question about reading the district court's opinion on that aspect, it's clear that the district court found deliberate indifference based on the continued confinement of far too many people at Metro West to enable social distancing. And on page 34, the district court says that without social distancing, all of these other measures are clearly inadequate. Everyone knows that. The scientific and medical consensus is that social distancing is essential to control the spread. And defendants repeatedly insist that the district court's finding rested on the skyrocketing rate of infection. And the state panel agreed with that. And now defendants say that, you know, in essence, the district court held them to strict liability. And that's simply not true. It was, of course, reasonable for the district court to consider the rate of infections as the backdrop for the reasonableness of the actions that defendants have taken. And also as a response to defendants' contention that the steps they're taking are completely adequate to control transmission of the disease. But the district court's deliberate indifference finding rested on the fact that there is scientific and medical consensus that the measures that they are taking will not be adequate to control transmission of the disease. And as a result, people are being subject to an objectively intolerable risk of harm to their lives and health. I just think, I guess my reading is that I think you and I are looking at the same portion of the order. I think sort of the money paragraphs are at 37 and 38. But you know, I think it's a fair paraphrase to say that the district court says, you know, even considering all the measures the defendants have adopted, setting aside any factual disputes, nonetheless, there's deliberate indifference. And then the district court basically gives two reasons. One, the defendants' contention that they have taken to date are sufficient is belied by the exponential rate of infection. Now, we know that that's sort of impermissible under FARMR. You can't backfill by the resulting harm. And then two, the court says, moreover, and then goes on to talk about social distancing, and says two things at the top of 38. Social distancing either is not possible or is not uniformly enforced. And then the next paragraph begins, thus. Thus, plaintiffs have met the subjective and objective components. I just don't see how there's anything in there, a part of the analysis about feasibility, let alone about junior not releasing people. The evidence is clear. On pages five to six, the district court also talks about the fact that medical experts agree that a reduction in the facility population is needed. I think when you read this opinion, it's clear that the district court's finding deliberate indifference based on the continued subjection of people to a serious risk of harm because they're being put into conditions of confinement in which social distancing, the measure that everyone agrees is necessary to prevent transmission, is not possible. And in terms of the feasibility of measures, you know, the district court uses the phrase not uniformly enforced. The district court pointed out that there's extensive evidence that there are key aspects of jail life in which social distancing is simply not happening. The declarations recite, for instance, that people are forced to stand up three times a day for headcount, for daily headcount, and that they stand shoulder to shoulder. And defendants haven't modified those key aspects of the way that the jail operates in order to ensure that social distancing is happening. But even if you don't see that, even if there's any question as to whether that's in there, the district court very clearly found that the failure to reduce the jail population and to continue to confine people in cramped conditions in the midst of a viral pandemic is...reflects deliberate indifference to their health and lives. So, Lloyd, let me ask you just one additional question, and then I'll let you go a little bit. So, deliberate indifference, you recognize, it's a high standard, right? It's got to be something that looks like recklessness. How is it that we can conclude that the defendants here were reckless, deliberately indifferent, unreasonable, acted unreasonably, in light of two things? One, sort of at a 30,000-foot level, all of the things that they did do, which the district court has basically given them in the way that it resolved this case. And two, the independent report, which says they were doing their best. How is doing their best deliberately indifferent, or even indifferent, for that matter? Well, the evidence... So, in terms of recklessness, the question is, do they know of ways to reduce the risk of harm and knowingly or recklessly decline to take those? And here, there is consensus that physical distancing is essential to control the spread. These other measures, while they are important, are not going to adequately abate the risk of harm to the people who are detained at Metro S. Defendants know that social distancing... They are fully aware that social distancing is essential, and yet they have failed to ensure that social distancing is happening throughout the jails. But more importantly, they're continuing to confine too large a population to ensure that social distancing is possible. And so, to your 30,000-foot question, this court's precedent is clear that even if you take some measures to abate a risk of harm, if you're not taking the most important and the most effective step and you're not going to adequately abate the risk when you know of a way to do so, that can be deliberately indifferent. And I think it's important... In essence, the fact that the defendants keep focusing on the fact that they don't have the authority to release, that's really irrelevant here. In essence, the state is deliberately indifferent by continuing to confine people. And under Ex parte Young, Director Jr. is the proper defendant to sue because he has a connection to the convicts complained of, which is the continued confinement of too large a population at Metro S. It's your point about legal authority that we shouldn't be so caught up about legal authority and instead, really, what we should be concerned with is sort of physical capacity to prevent the harm. I'm thinking about your flood example. Yes. And I think we try to explain in our brief, there's really kind of two ways to think about this. One is that when you're talking about systemic violations that are kind of a combination of factors at the state level, it does not make as much sense to focus so specifically on an individual person's intent. And the law professor, Zemecki Briggs, cites a number of cases in which this court has recognized a distinction between injunctive release suits and damages suits. For instance, they cite Smith v. Sullivan 611F2nd 1039, which is a Fifth Circuit case from 1980. And that was a suit for injunctive release. And a sheriff argued that a population cap in that case would require him to violate his statutory duty. This court said, quote, it's well established that inadequate funding will not excuse the perpetuation of unconstitutional conditions of confinement, nor will an allegedly contrary duty at state law. Same in Williams v. Bennett 689F2nd 1370, which is a 1982 case. And in that case, there had been a prior district court case involving alleged violations in the suit for injunctive release. The district court had entered injunctive release against various state defendants, including based on crowding. And this court said in a subsequent damages suit that the prior case didn't resolve the state of mind or intent of any particular defendant in failing to perform acts within their official responsibilities. It just resolved the corporate fault of, quote, state officialdom. And then it said intent of individuals is critical in a damages suit. And I think that the distinction between a damages suit and an injunctive release suit is critical. In a damages suit, it might well be proper to consider whether a defendant has the authority to take an action. But in an injunctive release suit, that's not a proper consideration. A federal person's fairly direct... On your theory then, I mean, would any defendant... Or, sorry, any individual with a key to the jail, or for that matter, a crowbar, have been a proper defendant? I mean, you know, there are lots of people who might have had the physical capacity to break the place open and let people out. Employees, janitors. I think that here the person who has the clearest nexus is Director Junior, and he is an obvious person to sue. But, you know, take for instance, if there were a person standing, a prison guard standing in front of a cell in which a person was starving, and state law said, you know, you can't provide food and water to a person who's in solitary confinement. I think that in terms of the deliberate indifference inquiry, you can certainly say that the prison official who fails, or the prison guard who fails to provide food and water in that circumstance is acting with a reckless disregard... Cancel two minutes. Thank you. That the prison guard standing there is acting with a reckless disregard for the health and life of the person standing there. Now, in a damages suit, it might be proper to say, well, they thought that they were bound by state law, and we don't want people to have to guess in that particular circumstance that they should disregard state law. But in a suit for injunctive relief, surely a federal court can tell that prison guard, yes, you need to provide food and water to avoid an objectively serious risk of harm. So I think the short answer to my hypotheticals, as far-fetched as they may be, is yes. That in a suit for injunctive relief, you could sue any employee of the prison because theoretically any employee could take whatever measures are necessary to break these people out. You know, I don't know that I would go so far as to say that any person with any tenuous connection to the jail, somebody could break into the jail and let the person out. I think under Ex parte Young, the question is does somebody have a clear nexus to the conduct that's complained of? We cite some cases in which county sheriffs are the proper person to sue when state court detention orders are requiring certain action. I think it's very clear that Director Junior has a very clear nexus to the conduct that's being complained of. He oversees the entire jail population at Metro West. And so under Ex parte Young, and cases like McNeil and Moore, which are cited in our brief, he is clearly a proper defendant in this circumstance. And so I think an aspect of the state decision that demands correction is its statement that the inability to take a positive action because of lack of authority precludes the finding of deliberate indifference. That is both wrong on the law, defendants cite no authority for it, the state panel also cited no authority for it. As I noted, there are cases in which this court has recognized the distinction in damages cases and injunctive relief cases. If that were the law, that would be an extremely dangerous situation in which, for instance, when there's a flood, a federal court would be powerless because there may not be somebody who has both the physical means and the authority to take the action that's necessary to alleviate a serious risk of harm. In this instance, I also want to note the district court's injunction was eminently critical given the constraints of the PLRA. The PLRA- I'm fired. With that, I'll conclude. I'll also say, defendants fail to establish any error in the key findings on which the district court's decision rests and the district court's injunction should be affirmed. Thank you. Thank you. May it please the court. I would like to begin by jumping into this court's precedent on the propriety of injunctive relief in a prison setting. And I think the two cases that I would direct the court's attention to are Hale versus Tallapoosa County and Lamartha against Turner, which is actually cited by the Amakai. And in both of those cases, what this court determined was necessary to find subjective evidence that deliberate indifference in the injunctive relief context was that the jailer had to know not of the dangerousness of the situation. It's not enough to know that COVID is dangerous. The jailer needs to know that there is a specific alternative policy that he can implement and is refusing to implement. And in both of those cases, the plaintiff had identified a specific policy. They had proven that the defendant was aware that they could adopt that policy and the defendant didn't do it. That's not what this is at all. It's not- Mr. Greenberg, it's Beverly Martin. I mean, Director Junior gave an order, if I'm remembering correctly, saying you have to institute social distancing policies right now, no exceptions. So that would indicate that he had knowledge and took action. And I guess that the plaintiff say has not occurred. Right, well, that's really only half of the analysis. If you actually look at Director Junior- He knows of the problem and he knows of the solution and he's directed both of those things to his employees. And the inmates are saying they hadn't happened. Right, well, I guess the last part of the analysis is really where their argument falls apart. Because if you look at Director Junior's declaration, and I'll call your attention to paragraph 76, 88, 100, and 102, look at paragraph 14 of the supplemental declaration and look at paragraph eight through 10 of Officer Almanar's declaration. What you'll see is that Junior has not just rested on his laurels. He's actually deployed staff to go through the facilities to do spot checks and to enforce social distancing. And what the inmates declaration say is that, yes, we are told to socially distance. There's announcements all the time. The infection report likewise found that they were achieving social distancing to the best that they could given the constraints of the prison. But that's not what the declarations say. The declarations say three times a day we have to stand shoulder to shoulder. They take us to the clinic in groups. So there's, again, there's a dispute of facts about this. Right, but the factual, first of all, it's not a factual dispute that played a part in the district court's order. Well, I mean, look, this court is charged with finding a likelihood of success on the merits, right, as a part of the injunction ruling. Right, and as this court recognized in the stay order, it couldn't do that unless it also found that the defendants were either approving or ignoring of those laxes, and it didn't. The reason we're talking about- Yeah, but we're not down by the stay order. This panel is not down by the stay panel's order. No, but in that case, it correctly applied Farmer. But the point that I'm trying to make, Your Honor, is the whole reason we're talking about individual social distancing, which is only one component of social distancing when you look at the CDC guidelines, is because it is the one aspect of the defendant's response to this pandemic that ultimately requires the voluntary compliance of thousands of inmates and hundreds of staff. So you can't hold the distance to be vicariously liable because it is not being perfectly enforced at all times. We now see this every day when we go into the supermarket and someone comes too close to us in one of the aisles. This is simply part of living with COVID, and to the extent that there is any consensus emerging, I wanna call the court's attention to the three district court cases we cited in the supplemental authority, and the two that we cited in our reply on page nine. All five of those cases have a factual scenario very similar to this, which is the jail has enacted sweeping social distancing regulations at the individual level, the group level, and the operational level. And there are declarations showing that there are some lapses in social distancing, which is obviously going to be inevitable in a jail with thousands of people. And in all of those cases, the district courts have found that is not indicative of deliberate indifference simply because social distancing is not occurring six feet at all times in all places. And when you look at page 11 of the CDC's guidance on social distancing, it suggests a number of strategies, but it does not contemplate that six feet will be maintained at all times, nor does it contemplate that the... That the jail will be depopulated. Your Honor, if I could just address the statute that you brought up initially, because I did pull that statute. And the way- Oh, okay. Sorry? That's okay. Okay, the way that it defines alternative housing is dormitory-style housing, which is actually, I'm talking about 951-231F, which is the very type of housing that Metro West has. The plaintiff did not put any evidence in the record at all that there was an alternative housing arrangement that could somehow be achieved in this case to achieve social distancing. Did you allow any discovery on that, or? I mean, you said there's no evidence in the record. I was just wondering the extent of discovery that went on on the topic. The district court only allowed very limited discovery, but of course, this was therefore unapproved. Oh. All right, thank you very much. Appreciate it. We will take the case under submission. That concludes our arguments for the day. We appreciate the presentation of all counsel, and court will reconvene tomorrow morning at nine o'clock Eastern time. Thank you. Thank you.